RICHARD F. STOKES
JUDGE

SUSSEX COUNTY COURTHOUSE
1 THE CIRCLE, SUITE 2
GEORGETOWN, DELAWARE 19947
TELEPHONE (302) 856-5264

June 26, 2018

Richard L. Abbott, Esquire
724 Yorklyn Road, Suite 240
Hockessin, DE 19707

Ralph K. Durstein, III, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

Valerie S. Edge, Esquire
Department of Justice
201 West Water Street, 3rd Floor
Dover, DE 19904-6750

RE: *Stevenson, et al. v. Delaware Dept. of Nat. Resources & Environmental Control, et al.*,
C.A. No. S13C-12-025 RFS

Dear Counsel:

Enclosed please find a copy of my decision after trial issued in the above-captioned matter.

Very truly yours,

Richard F. Stokes

cc: Prothonotary's Office

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAVID T. STEVENSON, | : | C.A. No. S13C-12-025 RFS |
| R. CHRISTIAN HUDSON, AND | | |
| JOHN A. MOORE, | : | |
| | | |
| Plaintiffs, | : | |
| | | |
| v. | : | |
| | | |
| DELAWARE DEPARTMENT OF | : | |
| NATURAL RESOURCES AND | | |
| ENVIRONMENTAL CONTROL, | : | |
| AN AGENCY OF THE STATE AND | | |
| SHAWN M. GARVIN, IN HIS | : | |
| CAPACITY AS SECRETARY OF THE | | |
| DEPARTMENT OF NATURAL | : | |
| RESOURCES AND | | |
| ENVIRONMENTAL CONTROL, | : | |
| | | |
| Defendants. | : | |

DECISION AFTER TRIAL


DATE SUBMITTED: March 14, 2018

DATE DECIDED: June 26, 2018



Richard L. Abbott, Esquire, 724 Yorklyn Road, Suite 240, Hockessin, DE 19707, Attorney for Plaintiffs.

Ralph K. Durstein, III, Esquire, Department of Justice, 820 N. French Street, Wilmington, DE 19801, and Valerie S. Edge, Esquire, Department of Justice, 201 West Water Street, 3rd Floor, Dover, DE 19904-6750, Attorneys for Defendants.



STOKES, J.

Pending before the Court is the attack of plaintiffs David T. Stevenson, R. Christian Hudson, and John A. Moore ("plaintiffs") on the amendment of regulations originally enacted pursuant to Delaware's Regional Greenhouse Gas Initiative and $CO_2$ Emission Trading Program Act ("Delaware's RGGI Act" or "Delaware's RGGI"). Plaintiffs' standing to pursue this matter has been a substantial issue since the complaint was filed, and the burden is on them to establish financial harm as a result of the amended regulations. Plaintiffs, however, have not established the probability of any financial harm to them. Furthermore, they have not addressed a most important factor: whether success in this litigation most likely would result in a decrease in their electricity prices, assuming they could establish an increase occurred because of the amended regulations. Instead of seeking to correct an actual harm, plaintiffs are officiously meddling with Delaware's RGGI Act. Because plaintiffs have not established they have standing to pursue this action, the case is dismissed.[1]

**Background Information on the Amended Regulations**[2]

Delaware's RGGI Act resulted from the State's participation in the Regional Greenhouse

---

[1]I incorporate by reference the following decisions previously rendered in this case: *Stevenson v. Delaware Dept. of Natural Resources and Environmental Control*, 2014 WL 4937023 (Del. Super. Sept. 22, 2014); *Stevenson v. Delaware Dept. of Natural Resources and Environmental Control*, 2016 WL 1613281 (Del. Super. Apr. 5, 2016), *rearg. den.*, 2016 WL 2620501 (Del. Super. Apr. 21, 2016); *Stevenson v. Delaware Dept. of Natural Resources and Environmental Control*, 2016 WL 4473145 (Del. Super. Aug. 19, 2016), *vacated*, 2016 WL 6768903 (Del. Super. Nov. 7, 2016).

[2]For the readers' convenience, I repeat a significant amount of the background information included in a previous decision, *Stevenson v. Delaware Dept. of Natural Resources and Environmental Control*, 2016 WL 1613281 (Del. Super. Apr. 5, 2016), *rearg. den.*, 2016 WL 2620501 (Del. Super. Apr. 21, 2016)

1

Gas Initiative ("RGGI"). Before December, 2005, environmental representatives of some states in the Mid-Atlantic (including Delaware) and in the Northeastern regions met to discuss the effective regulation of greenhouse gas emissions from coal and other fossil fuel power plants. The RGGI Program was developed. A brief summary of the RGGI Program appears in the DNREC's Secretary's Order No.: 2013-A-0054:

> The RGGI Program is the nation's first mandatory, market-based program to reduce emissions of carbon dioxide ($CO_2$), the principal human-caused greenhouse gas. The States participating in RGGI ... have established a regional cap on $CO_2$ emissions from the power sector, and are requiring power plants to possess a tradable $CO_2$ allowance for each ton of $CO_2$ they emit.

> This competitive carbon dioxide emissions trading program reduces $CO_2$ emissions from large coal and other fossil fuel fired electric generating units (units producing more than 25 Megawatts of electricity) in Delaware and the eight other States ... by establishing a regional cap on the amount of $CO_2$ that power plants can emit through the issuance of a limited number of tradable $CO_2$ allowances. These large polluting power plants are required by each Participating State's regulations to have and surrender one RGGI allowance for every ton of carbon dioxide they emit into the atmosphere. The Participating States make allowances available to generators through a[n] ... auction process. The proceeds from those auctions are returned to ratepayers in each state through energy efficiency investments and other clean energy programs.[3]

RGGI's goal to reduce greenhouse emissions caused by fossil fuels is accomplished several ways. The allowances' added costs to the more intensive carbon-fuel generators cause the less carbon-intensive energy generators and the non-carbon energy generators to be competitive and thus, to be awarded the clearing prices on the wholesale market. The goal also is accomplished by an investment of the proceeds from the purchased allowances into energy-efficiency programs, thereby reducing the demand for electricity.

---

[3]Secretary's Order No.: 2013-A-0054, which is located at Tab 4 of Plaintiffs' Trial Exhibit 1.

2

The states participating in the RGGI Program entered into a Memorandum of Understanding ("MOU") in December, 2005. The overall goal of the RGGI Program is set forth in the MOU as follows:

> The Signatory States commit to propose for legislative and/or regulatory approval a $CO_2$ Budget Trading Program (the "Program") aimed at stabilizing and then reducing $CO_2$ emissions within the Signatory States, and implementing a regional $CO_2$ emissions budget and allowance trading program that will regulate $CO_2$ emissions from fossil fuel-fired electricity generating units having a rated capacity equal to or greater than 25 megawatts.[4]

The MOU established the regional base annual $CO_2$ emissions budget at 121,253,550 short tons.[5] It further established Delaware's initial base annual $CO_2$ emissions budget at 7,559,787 short tons.[6] The MOU also states that "[f]or the years 2009 through 2014, each state's base annual $CO_2$ emissions budget shall remain unchanged."[7] The MOU further provides:

> Scheduled Reductions. Beginning with the annual allocations for the year 2015, each state's base annual $CO_2$ emissions budget will decline by 2.5% per year so that each state's base annual emissions budget for 2018 will be 10% below its initial base annual $CO_2$ emissions budget.[8]

The States agreed, through the MOU, to develop a Model Rule which would provide a framework for writing legislation to implement the RGGI Program.[9] The MOU stipulated that a comprehensive review of the Program would occur in 2012 and determined that various aspects

---

[4]MOU at 2, which is located at Tab 5 of Plaintiffs' Trial Exhibit 1.

[5]*Id.*

[6]*Id.* at 2-3.

[7]*Id.* at 3.

[8]*Id.*

[9]*Id.* at 6-7.

3

of the Program could be changed.[10] Finally, the MOU stated: "This MOU may be amended in writing upon the collective agreement of the authorized representatives of the Signatory States."[11]

In 2008, the Delaware Legislature enacted Delaware's RGGI Act. Both the Senate and the House of Representatives voted overwhelmingly in favor of the Act. The synopsis of the bill states as follows:

> This bill grants legal authority for Delaware to participate in the Regional Greenhouse Gas Initiative (RGGI) $CO_2$ cap and trade program. The bill grants DNREC the authority to implement the program including promulgating regulations and implementing or participating in an allowance auction as necessary to fulfill the goals of the program.[12] This bill further requires that all proceeds from the sale of RGGI $CO_2$ allowances be used for public benefit purposes and directs revenues to the Delaware Sustainable Energy Utility (SEU) for the promotion of energy efficiency and renewable energy technologies, to programs designed to help low income ratepayers, to a Greenhouse Gas Reduction Program and to DNREC for administration of the program.[13]

A review of Delaware's RGGI Act shows the following:

> The Memorandum of Understanding ("MOU") signed by the Governors of participating RGGI states requires each participating state to promulgate regulations to establish a cap-and-trade program for $CO_2$ with the goal of stabilizing $CO_2$ emissions at current levels through 2015 and reducing by 10 percent such emissions by 2019.[14]

Delaware's RGGI Act further explains that the MOU sets an initial emissions cap of 7,559,787 short tons of $CO_2$ for Delaware. It is specifically provided that this cap "may be

---

[10]*Id.* at 10.

[11]*Id.* at 11.

[12]Again, the goals were to reduce $CO_2$ emissions and to set up a method for achieving those reductions.

[13]144th General Assembly, S.B. #263.

[14]7 *Del. C.* § 6043(a)(8).

4

adjusted in the future."[15] Delaware's RGGI Act authorizes the Secretary "to promulgate regulations to implement the RGGI cap and trade program consistent with the RGGI Memorandum of Understanding, as amended."[16] This Act also directs the Secretary to participate with the other states in the RGGI Program and any national program which might be implemented.[17]

Regulations No. 1147 were promulgated and implemented in November, 2008.[18] The following explanation was contained therein:

> Beginning in 2009 through 2015, the emissions of $CO_2$ from any EGU [Electric Generating Unit] with a maximum rated heat input capacity of equal to or greater than 25 megawatts that is located in a RGGI state would be capped at current levels (emissions from Delaware affected facilities account for approximately 7.5 million tons). After 2015, the cap would be reduced incrementally to achieve a 10 percent reduction by 2019. Under the cap-and-trade program, one allowance is equivalent to one ton of $CO_2$ emissions allowed by the cap. Each subject EGU will be required to have enough allowances to cover its reported emissions during the three year compliance periods. The EGUs may buy or sell allowances, but individual EGU emissions shall not exceed the amount of allowances it possesses. The total amount of the allowances will be equal to the emissions cap for the RGGI states.[19]

The only facilities in Delaware required to have a $CO_2$ permit under Regulations No. 1147 are the City of Dover, NRG Dover, NRG McKee Run (a DEMEC facility), Vansant, Indian

---

[15] 7 *Del. C.* § 6043(a)(9).

[16] 7 *Del. C.* § 6044( c).

[17] 7 *Del. C.* §§ 6044( c) and 6047.

[18] Secretary's Order No.: 2008-A-0055, which is located at Tab 8 of Plaintiffs' Trial Exhibit 1.

[19] *Id.* at 2.

River (a NRG facility), Calpine Edgemoor, Calpine Hay Road, and Delaware City Refinery.[20] There are approximately thirty (30) units at these facilities impacted by Delaware's RGGI.[21] The entities holding the permits are Calpine, Edgemoor, Hay Road, NRG, DEMEC and the City of Dover.[22] These entities, which were required to obtain, and comply with, a permit and were directly subject to the regulations, had standing to appeal the regulations.[23] No entity required to have a permit appealed the enactment of Regulations No. 1147.

In general, allowances may be purchased at auction, purchased on the secondary market, gifted by direct allocation, or created through offset projects.[24] Pursuant to statute, the regulated facilities initially were given allowances over a five (5) year period, i.e., they did not have to purchase them.[25] Once given, an allowance lasts forever until used.[26] The regulated facilities had a large number of allowances in their accounts.[27] No information exists as to when any of the generators had to start purchasing allowances. The fact that allowances did not have to be purchased was not considered by plaintiffs' witnesses.

---

[20]Transcript of December 6, 2017, Trial Proceedings at C-47 (hereinafter, "C-__").

[21]C-46; C-49.

[22]C-48.

[23]7 *Del. C.* § 6001, *et seq.*; *Baker v. Delaware Dept. of Natural Resources and Environmental Control,* 2015 WL 5971784, * 10 (Del. Super. Oct. 7, 2015), *aff'd,* 137 A.2d 122 (Del. April 15, 2016).

[24]C-43-44.

[25]C-43-45; C-99; 7 *Del. C.* § 6045(d).

[26]C-45.

[27]C-111.

6

In 2012, as provided for in the RGGI MOU, a review took place of the RGGI Program and, in particular, the $CO_2$ Budget Trading Program. There was an oversupply of allocations[28] because of an unanticipated increase in the use of natural gas, which is a lower carbon-intensive fuel.[29] It was determined that changes in the market and changes in the program required a modification of the RGGI Program. As defendants explained, the review showed:

> [T]he initial emissions allocations were too generous with respect to actual emissions. To achieve emissions reductions, it was necessary to reduce all of the states' allocations. However, since it was always a concern that allowance prices could be driven too high, other changes were made to the Model Rule to prevent such occurrence.[30]

It was determined:

> * The Regional Emissions Cap in 2014 will be equal to 91 million tons. The Regional Emissions Cap and each Participating State's individual emissions budget will decline 2.5% each year 2015 through 2020.
> * The Participating States will address the bank of allowances held by market participants with two interim adjustments for banked allowances. The first adjustment will be made over a 7-year period (2014-2020) for the first control period private bank of allowances and a second adjustment will be made over a 6-year period (2015-2020) for the 2012-2013 period private bank of allowances.[31]

This agreement was not implemented by any amendment to the MOU. Instead, changes were made by way of an Updated Model Rule.[32] The Participating States agreed to revise their

---

[28]"Allocations" are also referred to as "allowances" in this decision.

[29]C-34.

[30]Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment at 26.

[31]RGGI 2012 Program Review: Summary of Recommendations to Accompany Model Rule Amendments at 2.

[32]This Updated Model Rule may be found at www.rggi.org.

regulations or statutes based on the Updated Model Rule and to do so by January 1, 2014.[33]

In accordance with this agreement, Delaware amended 7 DE Admin. Code 1147, stating:

> The amendments to the Model Rule will be incorporated into the Department's proposed amendments to 7 DE Admin. Code 1147, to ensure that Delaware's RGGI regulations are current with market conditions and continue to support reductions of $CO_2$ in the electricity generation sector.[34]

In Secretary's Order No.: 2013-A-0054, the Secretary explained that 7 *Del. C.* § 6043(a)(9) specifically states that the emissions "'cap and Delaware's allocation may be adjusted in the future'", and concluded: "[T]he Department believes that the statute grants the DNREC Secretary the authority to further reduce the emissions cap to comply with the emissions reduction goal."[35]

These amended regulations went into effect on December 11, 2013.[36] The reduction of $CO_2$ permits has tended to cause the prices of $CO_2$ allowances at auction to rise.[37]

No regulated entity which must purchase the allowances complained or filed an appeal from the amended regulations. As noted above, these regulated entities had standing to appeal because they were subject to the amended regulations.[38] This law renders meritless plaintiffs'

---

[33]RGGI 2012 Program Review: Summary of Recommendations to Accompany Model Rule Amendments at 3.

[34]Secretary's Order No.: 2013-A-0054 at 3, which is located at Tab 4 of Plaintiffs' Trial Exhibit 1.

[35]*Id.*

[36]*Id.* at 1.

[37]Transcript of December 4, 2017, Trial Proceedings at A-92 (hereinafter, "A-__").

[38]*Baker v. Delaware Dept. of Natural Resources and Environmental Control, supra.*

8

arguments that these regulated entities lack standing to sue because they will not suffer financial harm and thus, the amended regulations never could be reviewed absent plaintiffs' suit.[39]

Only plaintiffs appealed the amended regulations. Plaintiffs are not subject to the amended regulations. However, they allege they have/will suffer harm in fact in that the increased costs of the allowances will be passed on to them in their electric bills. As the litigation moved forward, plaintiffs' electric bills actually decreased over the pertinent time period. Consequently, plaintiffs' argument morphed to the argument that had the amended regulations not come into effect, they would have had to pay even less on their electric bills, and thus, they are financially harmed.[40]

**Dr. Tierney and her Testimony**

In order to render this decision, the Court relies upon the testimony of Susan F. Tierney, Ph.D. Dr. Tierney is defendants' expert. Plaintiffs seek to keep out all or portions of her testimony in several ways. First, they moved, during trial, to exclude certain testimony and evidence because plaintiffs contend it was "new" and defendants "sandbagged" them with it. Second, plaintiffs moved, before trial, to exclude her testimony.[41]

---

[39]It is surprising that plaintiff R. Christian Hudson would make this argument, which is diametrically opposed to the one he made, and won, in *Baker v. Delaware Dept. of Natural Resources and Environmental Control, supra.*

[40]A-9-10.

[41]This motion *in limine* was filed on December 1, 2017.

**Objection to "New Analysis"**

Plaintiffs pursue, in their post-trial briefing, their arguments initially made at trial that the Court cannot consider what they label "New Analysis" by Dr. Tierney. The only new information was the analysis of Stevenson's electric bill. There is a good deal of finger-pointing over this issue which this Court refuses to address. Objection to this is much to do about nothing because Stevenson himself admitted it is difficult to prove a direct link between PJM wholesale market prices and consumer utility bills.[42] The Court will exclude the analysis on Stevenson's electric bill only because it is too insignificant of an issue on which to spend time. The other information contained within the "New Analysis" reflects Dr. Tierney's previously-provided information. That information merely was turned into a demonstrative format. That is not "new" and the Court continues to rule, as it did at trial, that this demonstrative evidence may remain in evidence.

**Motion *in limine***

Dr. Tierney's resume' is forty (40) pages long.[43] She is an expert on energy economics, regulation and policy, particularly in the electric and gas industries. She currently is a Senior Advisor at Analysis Group Inc., where she provides policy, economic and strategy consulting in the energy industry. The company for which she works is an economic, financial, and business strategy consulting firm. She is the lead consultant on many of their projects. She has had a thirty (30) year career "as a regulator, policymaker, university professor, consultant, and expert

---

[42]Transcript of December 5, 2017, Proceedings at B-183 (hereinafter, "B-__").

[43]Her resume' appears at Exhibit SFT-1 to the June 15, 2015, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 5.

10

witness."[44] She speaks frequently at industry conferences. She serves on Boards and Advisory Committees for numerous energy institutes and foundations. She has published an extremely large number of reports and articles in her field of expertise.

As she explains, she has been directly involved in issues relevant to this matter as follows:

> economic analysis of issues affecting electric utilities, wholesale power markets and consumers' utility rates; utility regulation; price formation in electric power systems, including impacts of changes in fuel prices, technology changes, environmental requirements and other facts; the structure of the electric industry and implications for the reliable and economically efficient provision of electricity; the design of environmental polices to control emissions of air pollutants from the power sector and the implications of different policy designs for costs to power producers and to consumers; and the macroeconomic costs associated with wholesale and retail rate and price analysis.[45]

She has co-authored two reports which focused on the economic impacts of RGGI. The first, dated November 15, 2011, is titled, "The Economic Impacts of the Regional Greenhouse Gas Initiative on Ten Northeast and Mid-Atlantic States: Review of the Use of RGGI Auction Proceeds from the First Three-Year Compliance Period".[46] The second report, dated July 14, 2015, is titled, "The Economic Impacts of the Regional Greenhouse Gas Initiative on Nine Northeast and Mid-Atlantic States: Review of RGGI's Second Three-Year Compliance Period

---

[44]June 15, 2015, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 5, at p. 2, ¶2.

[45]June 15, 2015, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 5, at p. 2, ¶2.

[46]Attachment SFT-2 to June 15, 2015, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 5.

(2012-2014)."[47] These studies include a review of RGGI's economic effects in Delaware.

In deciding a motion for summary judgment, this Court previously ruled Dr. Tierney to be an expert on the pertinent areas in question.[48] Nothing at the hearing in this matter or in the post-trial briefing has changed that opinion. She has been involved directly in issues relevant to the matter at hand. She is uniquely qualified as an expert to speak to the issues relevant to this case, those issues being "the impacts of the State of Delaware's participation in the Regional Greenhouse Gas Initiative ("RGGI") and the impacts of such participation on the rates of electricity customers in Delaware and on the Delaware economy."[49]

Plaintiffs recognize Dr. Tierney is an expert. However, they seek to exclude her testimony on a number of grounds.

I first address plaintiffs' argument based upon an incorrect premise. Plaintiffs argue Dr. Tierney has not taken into account their contention that Delaware has not spent any of the additional $CO_2$ allowance auction revenues generated from the amended Delaware RGGI regulations.[50] Thus, they argue, her opinion that any increases in wholesale prices are offset by decreased use in electricity resulting from the allowance monies spent on energy-saving programs is invalid. This argument is based upon the incorrect premise that Delaware has not

[47]Attachment to June 7, 2016, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 4.

[48]*Stevenson v. Delaware Dept. of Natural Resources and Environmental Control*, 2016 WL 1613281 (Del. Super. Apr. 5, 2016), *rearg. den.*, 2016 WL 2620501 (Del. Super. Apr. 21, 2016)

[49]June 15, 2015, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 5, at p. 4, ¶ 7.

[50]Plaintiffs' February 22, 2018 Opening Post-Trial Brief.

12

spent any of the additional $CO_2$ allowance auction revenues generated from the amended RGGI regulations on energy-saving programs.

Upon the enactment of Delaware's RGGI, Delaware took 10% of the proceeds from the auction and applied them to the administration of the program while it applied 90% of the proceeds to consumer benefit programs.[51] Of that 90% being applied to programs which benefit consumers, 65% went to the Delaware Sustainable Energy Utility (SEU) for the promotion of energy efficiency and renewable energy technologies; 10% to the Weatherization Program; 5% to the Low Income Home Energy Assistance Program; and 10% to mitigation.[52] Since the enactment of the amended regulations, Delaware has spent monies for weatherization, mitigation and low income assistance. From 2012-2014, the State spent monies on low income assistance, on funding energy efficiency measures in the buildings of electricity consumers, on other greenhouse-gas emission reduction programs and investment in renewable energy.[53] This fact undermines plaintiffs argument that no monies have been applied to benefit consumers since the implementation of the amended regulations.

Plaintiffs' other argument is that because Dr. Tierney has stated she does not have an opinion on the impact of the amended regulations on the individual plaintiffs' electric bills, her

_____

[51]C-21. Pursuant to the MOU, Delaware's commitment was to use only 25% of the auction proceeds towards consumer benefits and the administration of the program.

[52]C-30.

[53]June 7, 2016, Affidavit of Susan F. Tierney, Ph.D., which is defendants' Trial Exhibit 4, at p. 15, ¶22. Although it is not in evidence, defendants represent in their briefing that monies from the SEU have not been spent during this time period. That is only a portion of the proceeds, not all of them.

13

opinion and all of the evidence presented by her should be excluded.[54] They then turn around and seek to include portions of her testimony, arguing that Dr. Tierney's submissions "establish that the New RGGI Regulations will directly and proximately cause an increase in the electric bills of consumers like the Plaintiffs who do not receive any subsidies or financial funding from the RGGI Program."[55]

Dr. Tierney's basic conclusions, based upon knowledge, data, studies, and experience, are as follows. Electric-generating units will incur increased costs associated with the amended regulations; however, other RGGI effects offset those increased costs and consumers' electric bills actually decrease rather than increase.[56] This results because the money from the auctions have been spent on energy-efficiency programs or products, which, in the end, have resulted in a decrease in demand and that has caused a lowering of electricity prices. To repeat, her studies show, and her testimony is, that in the end, Delaware consumers will not pay greater prices because of RGGI; instead, their electric bills are less than what they would be because of RGGI as originally imposed and as governed by the amended regulations.

Dr. Tierney did agree that she was not testifying on the impact of the amended regulations on each individual plaintiff's electric bills. Defendants had no obligation to study the individual plaintiffs' electric bills and provide an opinion on the effect of the amended regulations on them.

---

[54]Plaintiffs' February 22, 2018 Opening Post-Trial Brief at 32-35.

[55]Plaintiffs' February 22, 2018 Opening Post-Trial Brief at 19  This incongruity is repeated at page 26 of this brief, where they argue: "Tierney's statements have no bearing on the issue of whether the Plaintiffs have standing in this action. Instead, Tierney actually supports the fact that the Plaintiffs possess standing."

[56]A-20.

14

That was plaintiffs' burden.

Plaintiffs' motion *in limine* is denied. Dr. Tierney's specialized knowledge and training is based on sufficient facts and data and she has applied the appropriate principles and methods reliably to the facts. Dr. Tierney's testimony has educated the Court on electricity generation, the wholesale and retail pricing of electricity, the connection (which is not direct) between the costs generators incur and the retail prices consumers pay, and the effects of Delaware's RGGI on consumers' electric bills. Her testimony rebuts plaintiffs' witnesses' testimony by highlighting the flaws in Dr. Stapleford and Stevenson's knowledge, understanding and testimony on the issues at hand and by establishing plaintiffs' simplistic economic theory is inapplicable and invalid.

**Pertinent Basics of Electricity and Pricing[57]**

Plaintiffs ground their case on the basic economic theory that increased costs to the electricity generator directly result in increased prices to the consumer. Dr. Tierney's testimony and evidence establish that this theory does not apply in the context of electricity pricing.[58] She could not know the cause-and-effect connection between $CO_2$ permit costs and impacts on individual customers' bills because of "so many disconnections between the wholesale price formation and electricity rate-making for individual customers."[59] "[T]here is not a one-to-one

---

[57]The information contained herein mostly is drawn from Dr. Tierney's testimony, which appears at A-12-136.

[58]A-93. She opined: "Typical economic supply and demand concepts don't typically apply to the electric industry."

[59]A-114.

15

relationship between those circumstances in the wholesale market and the actual rates charged to consumers in their retail electricity bills."[60] The one-to-one relationship does not exist because of:

> (a) the character of the way that electric power plants are dispatched; (b) the manner in which price formation occurs in the wholesale electric industry in PJM; and ( c) and how the costs and carbon intensity of different power plants affects the ability of the generator to pass through $CO_2$ allowance costs to consumers. [61]

In order to better understand her conclusions and the workings of electricity production and pricing, I set forth some of the basic concepts.[62]

There are various types of generators of electricity, including, but not limited to, fossil fuel (oil, coal, or natural gas (which is less carbon intensive)); nuclear; solar; wind; geothermal; hydroelectric. Delaware is part of the PJM region, which consists of an integrated grid of power plants. The PJM[63] grid currently encompasses thirteen (13) states, including Delaware. PJM includes states that are non-RGGI participants and others that are RGGI participants. While PJM consists of thousands of generating units, only approximately thirty (30) of those units are affected by Delaware's RGGI.[64]

PJM (also referred to as the "grid operator") dispatches plants to supply power according

---

[60]A-21.

[61]August 25, 2016 Memorandum at 3, attached to September 8, 2016, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 3.

[62]Dr. Tierney explained these conclusions in more detail during her testimony. A-28-31; A-35-39; A-60-61.

[63]Initially, Pennsylvania, New Jersey and Maryland made up this grid; hence, the abbreviation "PJM".

[64]C-46; C-49.

16

to their offer price. The offer prices are based on the plants' cost to produce electricity. The grid operator decides how many of those offering plants to dispatch at any point in time in order to meet instantaneous demand. "[I]t is the offer price of the generator whose output (when combined with output from generators with lower offer prices) serves to satisfy demand sets the clearing price."[65] The price of the last generator called upon to operate in a particular moment is the clearing price. Every generator selected to provide power at that moment is paid that clearing price. The group of plants dispatching power can include carbon-intensive and less carbon intensive generators and/or non-carbon energy generators. The clearing price varies across the course of the year and across the time of day as demand for electricity goes up and down.

When demands are greater, more power plants are dispatched to meet the demand. Including $CO_2$ prices in the offer prices can change the dispatch order of plants and make the less carbon intensive and/or non-carbon generators more competitive.[66]

Reductions in peak demand reduce the costs of electricity because the dispatch of power from relatively costly plants is avoided.[67] Energy efficiency programs can cause those reductions in peak demand.[68] Even plaintiff Moore agreed that significant or drastic reductions in demand

---

[65] August 25, 2016 Memorandum at 5, attached to September 8, 2016, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 3.

[66] PJM has a market monitor who evaluates whether the markets are competitive. In fulfilling that job, the market monitor prepares a report where the monitor tries to identify the drivers or components that constitute the cost of producing electricity. Recently, the biggest driver is the use and cost of natural gas. As noted earlier, the major trigger for reducing allowances in the amended regulations was the oversupply of them because of an unanticipated increase in the use of natural gas, which is a lower carbon-intensive fuel.

[67] A-25-29.

[68] A-25-29; A-160-61; B-165.

17

and costs can be achieved fairly economically.[69]

To repeat, the generators which are a part of the clearing price at a particular moment can include carbon-intensive generators, less-carbon intensive generators and/or non-carbon generators. The clearing prices, which include the price of $CO_2$ allowances, are based upon:

> many variables that would have both an upward and downward effect on prices.
> For example, demands for electricity were flatter than you might have seen in the recent past. That would tend to reduce the demand for carbon allowances because you don't have to generate as much electricity.
> So economic conditions, if natural gas prices are cheaper than coal, then that would reduce the demand for allowances. So a lot of different things would go into expectations about forward prices.[70]

Dr. Tierney further explained:

> But there is not a one-to-one relationship between the cost incurred by power plant owners to keep their plants open and then to generate power from that, on the one hand, and the prices that are paid to power plant owners, or the electricity and capacity that they produce to the system.
> So, in fact, there are some power plant owners who do not enjoy the opportunity to pass along all of their costs because of the way the prices are formed in the markets that happen to coincide with the RGGI states. Each of the RGGI states operates in a power plant centralized wholesale market that does not allow for a one-to-one pass-through of costs of power plant owners into wholesale prices paid by consumers.[71]

Because the hourly electricity prices established in the PJM are federally regulated, many of the costs imposed by the individual states (such as RGGI allowances) cannot be passed on in the wholesale market.[72]

---

[69]A-160.

[70]A-93-94.

[71]A-135-36.

[72]June 7, 2016, Affidavit of Susan F. Tierney at pp. 8-9, ¶13, which is Defendants' Trial Exhibit 4.

The problems with tracking RGGI costs (if any) from the generator to the retail consumer are compounded by the subsequent steps involved in obtaining electricity.

Plaintiffs are retail customers either of Delmarva Power or Delaware Electric Cooperative ("DEC" or "Delaware Electric Co-Op"). Dr. Tierney explained how the two companies acquire their electricity and set prices for their customers.

She first addressed Delmarva Power:

> ... [A] utility like Delmarva Power is a utility that is a wires-only electric company. Those customers of Delmarva Power who are purchasing what is called bundled electricity service and they are purchasing their total electricity supply and wires – essentially paying for the cost of transmission and distribution facilities, I'm calling that wires. What I described in the wholesale market is supply.
>
> So Delmarva Power doesn't own any power plants. It has to purchase from the wholesale markets, from contractors[73] to supply service for Delmarva Power consumers. And the way that that works is those power suppliers offer to Delmarva Power to provide electricity, for example, to a residential electricity customer at a certain price that is fixed in advance, and then that is held in place for a three-year period of time.
>
> So let's say we're standing in 2014. The way that it works for Delmarva Power is that one-third of the supply that's available to meet a customer's demand in 2014 is provided by somebody who offered and won the contract three years before that. They have a three-year contract for a third of the supply.
>
> Then two years in advance of 2014 there is another supplier who has won a contract. He or she is providing a third. And then in 2013 someone won that offer and they are ... supplying one-third of supply to Delmarva Power.
>
> The electricity customer, therefore, in 2014, is paying contract prices established before 2014, and long before 2014 in some cases, but also long before the end of 2013 when those contracts were established.
>
> Okay. So over time those contracts, those supply contracts for Delmarva Power customers, are not only provided well in advance, but they reflect the expectation of those suppliers about a myriad of things; most importantly, the cost of natural gas and the expectation about how much demand is going to go up or down or so forth.
>
> The prices that were provided to Delmarva Power customers have gone down

---

[73]Plaintiffs refer to these contractors as "market Sellers".

during this period of time, since 2014, 2015, 2016.[74]

So basically, with regard to Delmarva Power, the prices customers pay stem from contract prices which are reached based on numerous factors. Even Delmarva Power cannot determine what amount of increased costs for RGGI might be passed on to a retail customer.[75]

Dr. Tierney then explained that Delaware Electric Co-Op differs from Delmarva Power.[76] Delaware Electric Co-Op buys its power from Old Dominion Electric Co-Operative ("Old Dominion"). Old Dominion does not operate in Delaware, but it has power plants in Maryland and Virginia that supply power to Delaware Electric Co-Op. In addition, Old Dominion buys power from suppliers that participate in the PJM wholesale market. Thus, Delaware Co-Op's prices are supply prices that are affected by Maryland's RGGI and the PJM.

Dr. Tierney's testimony shows that because of the various factors which go into electricity generation, wholesale pricing, and consumer pricing, plaintiffs' witnesses' opinions that an increase in the costs of $CO_2$ allowances directly results in an increase in electricity costs to the consumer are invalid.

---

[74]A-29-31.

[75]April 28, 2015, letter from Todd L. Goodman, Esquire, Associate General Counsel to Delmarva Power. This letter, dated April 28, 2015, is to Jason R. Smith, Public Utilities Analyst to the Delaware Public Service Commission ("PSC") in response to plaintiff David Stevenson's request, on behalf of the Caesar Rodney Institute (CRI), to open Phase II workshops in regards to a PSC Docket concerning bill transparency of Delmarva's bills. The purpose of Mr. Goodman's letter was to correct inaccuracies CRI made in its request. The inaccuracies address the issue at hand. This letter is located at Exhibit D of the Appendix to Defendants' Post-Trial Memorandum, filed February 22, 2018.

[76]A-31-32.

**The Plaintiffs**

There are three plaintiffs: R. Christian Hudson, John A. Moore, and David T. Stevenson.[77]

The first plaintiff is **R. Christian Hudson** ("Hudson"). He is a resident of Sussex County. The basis for his lawsuit is as follows:

> Well, you know, in general, I think the DNREC, I've been a party to a number of suits where we felt, and in some cases the Court ruled, that the DNREC overstepped their bounds. And I feel that this is yet another one where I feel that they should have to follow their own law.[78]

He is a customer of Delmarva Power and has been since at least early 2013.[79] He cannot point out on his electric bills a dollar amount attributable to the Delaware RGGI Program or to the changes to that program.[80] He is relying on plaintiff David T. Stevenson and John E. Stapleford, Ph.D., an economist, to establish the 2013 amended Delaware RGGI regulations negatively impacted his power bills.[81]

The second plaintiff is **John A. Moore** ("Moore").[82] He is a Delaware resident and is a customer of Delmarva Power. He acknowledged he did not pay a lot of attention to his electric

---

[77]At one point, Jack Peterman was a plaintiff. He was dismissed as a plaintiff earlier in the litigation but an order was not entered at that time directing the amendment of the caption to reflect that action. That oversight is corrected at this time; Jack Peterman is removed from the caption as a party and the caption hereinafter reads as set forth on the front page of this opinion.

[78]A-139-40.

[79]A-140-41.

[80]A-143.

[81]A-142.

[82]His testimony appears at A-154-64.

21

bills.[83] He, too, is relying upon experts like David T. Stevenson to show the impact of the amended regulations on his electric bills.[84] However, he thinks "it also just stands to reason that when one state has a tax that our neighborhood [sic] states don't have, that we're paying more for electricity because of that tax."[85] This is a complaint against Delaware's RGGI in general and not to the amended regulations in particular. He joined the lawsuit because he feels that Delaware's RGGI itself "was an unnecessary burden on Delaware business and on Delaware consumers."[86]

The third plaintiff is **David T. Stevenson** ("Stevenson").[87] Stevenson also is a resident of Delaware. He is a customer of Delaware Electric Co-Op. As explained earlier, Delaware Electric Co-Op buys its power from Old Dominion, which does not operate in Delaware. Old Dominion acquires its electricity from Maryland, Virginia, and PJM. Out of the thousands of units of PJM upon which Old Dominion might call, only thirty (30) are impacted by Delaware's RGGI.[88] Thus, there is the remote possibility that at times, the sources of the supply of electricity to Stevenson "<u>may</u> be produced in part by Electric Generation facilities located in Delaware that must have $CO_2$ Permits. [Emphasis added]"[89]

---

[83]A-164.

[84]A-158.

[85]*Id.*

[86]A-155.

[87]His testimony appears at pages B-59–186.

[88]C-46; C-49.

[89]Plaintiff's Opening Post-Trial Brief, dated February 22, 2013, at 7.

22

**Standing**

The Court will not consider the merits of plaintiffs' arguments unless they have standing.

As the Supreme Court has explained:

> The concept of "standing," in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance. It is concerned only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy. In order to achieve standing, the plaintiff's interest in the controversy must be distinguishable from the interest shared by other members of a class or the public in general. Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are "mere intermeddlers." [Citations omitted. Emphasis in original.][90]

The Supreme Court further explained what a party must show in order to establish

standing:

> To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an "injury-in-fact"; and second, that the interests he or she seeks to be protected are within the zone of interests to be protected.[91]

The injury in fact element is detailed as follows:

> (1) the plaintiff must have suffered an injury in fact- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[92]

---

[90]*Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).

[91]*Dover Historical Soc. v. City of Dover Planning Com'n*, 838 A.2d 1103, 1110 (Del. 2003).

[92]*Id.*, quoting *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175-76 (3rd Cir. 2000).

23

Stevenson does not have standing to pursue this case. He has not presented any evidence which establishes that it is **probable** that Old Dominion will purchase electricity from a **Delaware** fossil fuel generator which will cause Stevenson's bill to increase. Plaintiffs merely argue that the purchase from one of the thirty (30) generators in Delaware out of a group of thousands in PJM may happen. Stevenson's injury, if there is one, is conjectural or hypothetical.[93] Consequently, Stevenson, who has not attempted to show it is probable that he has been financially injured as a result of **Delaware's** amended regulations, lacks standing in this matter and is dismissed as a plaintiff.

Alternatively, even if the Court gave Stevenson a pass and did not rule at this point that Stevenson absolutely has no standing to pursue this matter, his standing suffers the same fate as the other two plaintiffs for the reasons discussed below.

In this case, there were three ways plaintiffs could have shown they have suffered a concrete, actual injury directly related to the amended regulations which decreased the $CO_2$ allowances.

The first way would have been by producing electric bills which show an increase in what they paid attributable to the amended regulations. They did not attempt to do this. In fact, as noted above, plaintiffs fought very hard to keep out any analysis regarding the connection between the amended regulations and Stevenson's electric bill from Delaware Electric Co-Op.[94] As the Court previously noted, that fight was much to do about nothing because Stevenson acknowledged the difficulty for him "to prove a direct link between the PJM wholesale market

---

[93]*Id.*

[94]Plaintiffs' Opening Post-Trial Brief, dated February 22, 2013, at 35-38.

24

prices and consumer utility bills."[95]

The second way they could have shown that increased costs were passed on to them is by establishing that Delmarva Power or Delaware Electric Co-Op sought from the Public Service Commission an increase in rates because of the amendments. That has not happened.

The final way to prove their case was to produce an expert, or experts, to testify that the increase in costs attributable to the amendments resulted in an increase in retail costs to consumers such as themselves. They attempted to do this by offering John E. Stapleford, Ph.D. and plaintiff Stevenson as experts.[96] While both men are educated and knowledgeable about certain subjects, they are not experts on electricity pricing or on RGGI and its effects on electricity pricing. Thus, I reject their opinion that the amended regulations resulted in financial harm to plaintiffs.

Delaware's Rules of Evidence Rule 702[97] addresses testimony by experts. It provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Dr. Stapleford has a Bachelor of Science in Chemistry from Denison University, a

---

[95]B-183.

[96]Defendants filed motions *in limine* to exclude the opinion testimony of these witnesses. The Court allowed the witnesses to testify with the understanding that it would render a decision on the admissibility of their testimony in this final decision.

[97]Although the Rules of Evidence were revised as of January 1, 2018, there are no substantive changes to the Rule applied here.

Master's Degree in Government and Planning from Southern Illinois, and a Ph.D. in Urban and Regional Economics from the University of Delaware. He has worked in government and in the private sector as an economist and has taught economics. He has testified before various courts and before the Alcohol Beverage Control Commission. He has not, however, ever testified as an expert witness on utility pricing.[98] Dr. Stapleford clarified he is not an expert in electricity generation.[99] He agreed that his role as an expert was limited to the impact of RGGI on the Delaware economy.[100]

Stevenson has a Bachelor of Science degree in agricultural economics. He has served as a consultant for the Delaware Public Advocate in energy-related dockets in Delaware. He has intervened in numerous Delaware Public Service Commission dockets. He is a successful entrepreneur. He has worked in sales, technical and management positions. At the time he testified, he was employed by the Caesar Rodney Institute, a public policy advocacy organization, where he held the position of Director for Center for Energy Competitiveness. He also was President of Alternative Strategies Consulting, which is a paid consulting firm where he consults on energy and environmental issues. Stevenson has no work experience or academic training in the fields of utility pricing, the electric industry, or carbon-emission allowance trading markets. He admitted he lacked the specialized education or training in the pertinent areas. He is self-taught. This is the first time he has attempted to testify in a court as an expert.

Dr. Stapleford and Stevenson collaborated and produced a joint report dated August 6,

---

[98]B-45.

[99]B-23.

[100]B-45.

2016, and captioned "Cost Impacts of 2013 RGGI Rule Changes in Delaware" ("Report").[101] Dr. Stapleford had to rely upon Stevenson for some of the conclusions while Stevenson had to rely upon Dr. Stapleford for other conclusions. In this report, they concluded as follows:

> Our conclusion, to a reasonable degree of economic and electric industry certainty, is the 2013 RGGI rule changes increased consumer electric rates in Delaware by $33.6 million between March of 2013, and March of 2016, or about $11 million a year. In addition, the net effect of indirect costs and benefits raised electric rates another $28.5 million a year for a total of $39.5 million a year in cost that is passed from generators, to distributors, to electric customers, or roughly $42 a year for residential customers. [Emphasis in original.][102]

They also reached an additional conclusion:

> Our conclusion, to a reasonable degree of economic and electric industry certainty, is no offsetting benefits accrued from RGGI permit sale revenue as the revenue raised from the cost premium of permits from the new auction rules triggered by the 2013 RGGI regulation amendments sits unspent and will not likely be spent in the future. [Emphasis in original.][103]

This Report fails to cite to independent research or to the results of the witnesses' own work. The Report assumes that all allowances had to be purchased. That is an incorrect assumption. Pursuant to statute,[104] Delaware gifted the generators allowances over a five-year period.[105] The generators had "a very hefty bank account."[106] These allowances last forever,[107]

---

[101]This report is located at Tab 20 of Plaintiffs' Trial Exhibit 1.

[102]Report at 2.

[103]Report at 14.

[104]7 *Del.C.* § 6045(d).

[105]C-99.

[106]C-111.

[107]C-45.

27

and it may be a long while before a generator needed to purchase an allowance.[108] Allowances also may be acquired if the generator was "an offset project sponsor"[109]; allowances are awarded for the emissions that the generator would avoid by undertaking a project which reduces greenhouse gas emissions, such as "planting a tree, forestry projects, implementing building energy, energy efficiency."[110] Thus, the basic conclusion that the generators all purchased allowances pursuant to the amended regulations is wrong. That means that the assumptions that all the generators paid more for the allowances after the implementation of the amended regulations and then passed on those increased costs is wrong. This error goes towards rendering the Report's conclusions to be unreliable.

The Report counters the conclusions of Dr. Tierney. However, Dr. Stapleford does not know information about the PJM interconnection region and he cannot state whether Dr. Tierney is correct when she testified that some attributes of PJM are not purely market-based.[111] He has not looked at the literature and he does not know if there are benefits from weatherization and if they have been measured.[112] He did not focus "on the details of weatherization and things like that."[113] He did not look at the computer model Dr. Tierney used in connection with her study.[114]

---

[108]C-111.

[109]C-43.

[110]C-44.

[111]B-18-19.

[112]B-33.

[113]B-45.

[114]B-33.

28

Dr. Stapleford was incorrect when he said there was a cap on the auction price.[115] Also, Dr. Stapleford opines that decreased electric demand ultimately results in increased prices.[116] However, this is a basic misunderstanding regarding the operation of the electricity market since reductions of peak demand reduce the costs of electricity because the dispatch of power from relatively costly plants is avoided.[117]

With regard to consumers, Dr. Stapleford considers RGGI to be taxation without representation.[118] According to him, "the impact on business is from an economic standpoint has greater consequences over time."[119] His testimony and opinion focus on the general impact of Delaware's RGGI on businesses in Delaware and do not focus on the impact of the amended regulations on the plaintiffs in this case.

Dr. Stapleford verified that questions about utility pricing on the wholesale market and the affect, if any, on consumer bills should be directed to Stevenson, not him.[120] In order to address the pertinent question of whether it is **probable** that Delaware electric consumers such as plaintiffs would pay any additional amount due to the $CO_2$ allowance prices increase, Stevenson conceded he would have to rely on Dr. Stapleford for that answer.[121] Dr. Stapleford, however, as

---

[115]C-45; B-10.

[116]Report at 12; B-22-23.

[117]A-25-27. Plaintiffs Stevenson (B-165) and Moore (A-160-61) agree this to be the case.

[118]B-15; B-28.

[119]B-15-16.

[120]B-46.

[121]B-112.

29

just noted, did not give an opinion on this question, stating he would rely upon Stevenson to answer it.[122] To the extent it is asserted that Dr. Stapleford gave an opinion, the Court rejects that opinion. Dr. Stapleford does not have expertise or knowledge about electricity generation and utility pricing. His conclusions are based on erroneous assumptions. He does not provide any research methods, evaluation techniques, or data to support his conclusions. This Court has no confidence that Dr. Stapleford has applied reliable principles and methods regarding electricity generation and utility pricing to the facts of the case. His opinion is not reliable on the question of whether consumers such as plaintiffs would pay an additional amount due to the increase in $CO_2$ allowance prices. Thus, the Court excludes Dr. Stapleford's opinion testimony.

I also conclude Stevenson is not an expert on RGGI and its effects on his and the other plaintiffs' electric bills. I do not accept his opinion testimony, either.

Stevenson's failure to consider that many allowances were gifted to the generators and that the generators could offset allowances renders his conclusions flawed.

He ignored the fact that it is only a remote possibility that Delaware Electric Co-Op would pass on **Delaware** RGGI's costs.

When Stevenson referred to the costs containment reserve as a cap which would set the floor price, he was wrong.[123] Instead, it is a mechanism to reduce the price if the price goes up higher than expected:

> The purpose of a cost containment reserve is to contain costs in the event that unforeseen events occur, units have to shut down, nuclear facilities suddenly are not operating and emission prices — or emissions in the region go up beyond

---

[122]B-46.

[123]C-38.

what the regional cap or the state budgets are. So we would then introduce at auction an additional amount of allowances in order to reduce the costs of allowances and compliance by our compliance entities.[124]

Stevenson also was incorrect when he spoke about the installation of mercury controls on the Indian River Power Plant.[125] His argument was supported by an erroneous understanding of the facts, a flaw which goes to the reliability question.

His claim that there has been no reduction in peak energy demand attributable to the 2013 Amendments is flawed because he ignores the appropriations which Dr. Tierney studied.[126]

His assumption that low income consumers would use subsidies to purchase more expensive appliances that would increase their usage, rather than making efficient choices that would lead to decreased electric bills, is unsupported, thereby rendering his decision to discount reductions in peak demand attributable to demand reduction strategies unsupported.

His calculations on the costs of allowances omitted the impact of the federal Clean Power Plan.

In this case, Stevenson lacked training in the field of utility pricing and electricity generation. He did not provide data or scientific studies to support his opinions. He did not establish he reliably applied accepted economic principles and methods to the facts and conclusions he presented. Key parts of his conclusions were based on inaccuracies. Stevenson's opinion testimony is not reliable and the Court refuses to accept it.

---

[124]C-38-39.

[125]B-112-13; C-125-27.

[126]June 7, 2016, Affidavit of Susan F. Tierney, Ph.D., which is Defendants' Trial Exhibit 4, at p. 15, ¶ 22.

In light of the foregoing, the Court concludes that plaintiffs failed to produce an expert opinion to establish that an increase in the allowance costs have and/or will result in financial harm to them.

Finally, and very importantly, plaintiffs have not even attempted to show it is likely that their alleged harm will be redressed by a favorable decision in this litigation.[127] The only evidence regarding what would happen if the amended regulations were deemed invalid came from Valerie Gray, the Department of Natural Resources and Environmental Control Program Supervisor with responsibilities for RGGI. She explained that if the amended regulations are deemed invalid, no one knows what will happen.[128] Delaware may have to withdraw from the auction but the utilities still will be required to buy allowances. Could that mean buying allowances from the other states or from secondary sources? If they are purchased from secondary sources, then the prices are likely to be higher since, as plaintiffs noted, secondary sources purchase allowances with the hopes of making a profit.[129] Would that result in returning the utility prices to the point they were before the amended regulations came into effect or would that result in even greater utility prices? It is pure speculation to say what will happen. The failure to address this issue is fatal to plaintiffs' standing, in and of itself.

In the end, I conclude plaintiffs are intermeddlers. They lack standing and their case is dismissed with prejudice.

---

[127]The Court could have resolved the entire issue of standing against plaintiffs on this single failure.

[128]C-66-68; C-103-04.

[129]Plaintiffs' August 6, 2016 Report, "Cost Impacts of 2013 RGGI Rule Changes in Delaware" at 3.

32

**Conclusion**

For the reasons set forth herein, the Court rules as follows:

1) Jack Peterman is removed from the caption as a party and the caption hereinafter reads as set forth on the front page of this opinion.

2) The Court grants defendants' motions *in limine* and excludes the opinions of Dr. Stapleford and David T. Stevenson.

3) The Court denies plaintiffs' motion *in limine* to exclude the opinions and evidence of Dr. Tierney.

4) For the various reasons set forth above, plaintiffs lack standing to pursue this action.

5) The action is dismissed with prejudice.

**IT IS SO ORDERED**.